IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| CHERYL K. VANSANT, | ) | C/A No. 2:14-CV-02271-MGL-MGB |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | REPORT AND RECOMMENDATION |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

   This case is before the court for a Report and Recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).  The Plaintiff, Cheryl K. Vansant, brought this action pursuant to Section 205(g) of the Social Security Act, as amended, (42 U.S.C. Section 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security Administration regarding her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

   The Plaintiff applied for DIB on February 24, 2011, and was 46 years old on her alleged disability onset date of November 3, 2010. (R. 159.)  The Plaintiff claimed disability due to chronic knee pain, interstitial lung disease, chronic back pain, and a nervous disorder.  (R. 185.) The Plaintiff's application for DIB was denied, and she exhausted her administrative remedies. The Administrative Law Judge ("ALJ") issued his decision on February 1, 2013, and it is now the Commissioner's final decision for purposes of judicial review.  (R. 13-25.)  In making the

determination that the Plaintiff is not entitled to benefits, the Commissioner adopted the following findings of the ALJ:

> (1)  The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.
>
> (2)  The claimant has not engaged in substantial gainful activity since November 3, 2010, the alleged onset date (20 CFR 404.1571 *et seq*.).
>
> (3)  The claimant has the following severe impairments: interstitial lung disease and arthritis (20 CFR 404.1520(c)).
>
> (4)  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> (5)  After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except no lifting or carrying over 10 pounds occasionally and 5 pounds frequently; no standing and/or walking over 2 hours in an 8-hour workday; no more than occasional stooping, twisting, crouching, or climbing of stairs or ramps; no kneeling, crawling, balancing or climbing ladders or scaffolds; avoidance of unprotected heights and machinery with exposed, hazardous moving parts; an environment reasonably free from dust, fumes, gases, odors, and extremes of temperature and humidity; and no physical contact with others or close proximity such as office cubicles.
>
> (6)  The claimant is unable to perform any past relevant work (20 CFR 404.1565).
>
> (7)  The claimant was born on October 30, 1964 and was 46 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date. (20 CFR 404.1563).
>
> (8)  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).
>
> (9)  The claimant has acquired work skills from past relevant work (20 CFR 404.1568).
>
> (10)  Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in

>     the national economy. (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).
>
>     (11)    The claimant has not been under a disability, as defined in the Social Security Act, from November 3, 2010, through the date of this decision (20 CFR 404.1520(g)).

(R. 13-25.)

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in the Act as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than" twelve months. *See* 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, the Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Administration's official Listing of Impairments found at 20 C.F.R. Part 4, Subpart P, Appendix 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520.  If an individual is found not disabled at any step, further inquiry is unnecessary. *See* 20 C.F.R. § 404.1520(a)(4); *see also Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if she can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. *See* SSR 82-62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his

inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). She must make a *prima facie* showing of disability by showing that she is unable to return to her past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983); *see also Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

Once an individual has established an inability to return to her past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. *See Grant*, 699 F.2d at 191. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *See id.* at 191-92.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner "are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990); *see also Richardson v. Perales*, 402 U.S. 389 (1971); 42 U.S.C. § 405(g). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing 42 U.S.C. § 405(g); *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "substantial evidence" is defined as:

> such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be less than a preponderance.

*Smith v. Chater*, 99 F.3d 635, 637-38 (4th Cir. 1996) (internal quotation marks and citations omitted). Thus, it is the duty of this Court to give careful scrutiny to the whole record to assure

4

that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## DISCUSSION

### 1. The ALJ's Assessment of the Opinion of Dr. Daniel Love

Dr. Daniel Love was the Plaintiff's treating physician for her interstitial lung disease. The record reflects that Dr. Love was treating the Plaintiff as early as March 5, 2007, and regularly examined and treated the Plaintiff through the date of Dr. Love's physical capacities evaluation dated January 26, 2012 (herein after "the opinion"). (R. 311; 344.) In the opinion, Dr. Love stated that the Plaintiff was able to sit one hour and stand/walk less than one hour in an eight hour work day and required the option to alternate between sitting and standing. (R. 343.) He indicated the Plaintiff was able to perform simple grasping, pushing and pulling, and fine manipulation with both hands. When asked whether the Plaintiff could "use hands for repetitive tasks," Dr. Love responded by stating "[t]he patient said yes and no to both questions, but was more on the answer no to both of these questions." (*Id*.) Dr. Love stated that the Plaintiff could not use either foot to operate foot controls. Dr. Love opined that the Plaintiff could occasionally lift five pounds and never any more than five pounds. (R. 344.) Dr. Love stated that the Plaintiff could never climb, balance, stoop, kneel, crouch, crawl, or reach above shoulder level. Dr. Love opined that the Plaintiff has a total restriction of unprotected heights; exposure to marked changes in temperature and humidity; and exposure to dust, fumes, and gases. Additionally, the Plaintiff is moderately restricted from being around machinery and driving automotive equipment.

The ALJ found Dr. Love's opinion was not entitled to controlling weight for four discrete reasons. (R. 21.) The ALJ found that the opinion was not consistent with Dr. Love's own longitudinal treatment record. (*Id.*) Citing SSR 96-5p, the ALJ stated that the opinion was not binding because Dr. Love was not a "physician designated by the Commissioner" and "giving controlling weight to the opinion "would, in effect, give [Dr. Love] the authority to decide the issue of disability." (*Id.*) The ALJ further discounts the opinion because at least parts of it were based on the Plaintiff's response to questions. (*Id.*) Finally the ALJ noted that Dr. Love's opinion might have been formulated to appease the Plaintiff as his patient rather than based on medical evidence. (*Id.*) The ALJ does not cite any evidence to support this contention. (*Id.*)

Under the regulations of the Social Security Administration, the Commissioner is obligated to consider all medical evidence and the opinions of medical sources, including treating physicians. 20 C.F.R. § 404.1545; *see also* 20 C.F.R. § 404.1527. The regulation, known as the "Treating Physician Rule," imposes a duty on the Commissioner to "evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Special consideration is to be given to the opinions of treating physicians of the claimant, based on the view that "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). Under some circumstances, the opinions of the treating physicians are to be accorded controlling weight. Even where the opinions of the treating physicians of the claimant are not accorded controlling weight, the Commissioner is obligated to weigh those opinions in light of a broad range of factors, including the examining relationship, the nature and extent of

6

the treatment relationship, supportability of the opinions in the medical record, consistency, and whether the treating physician was a specialist. 20 C.F.R. § 404.1527(c)(1)-(5). "A treating physician is entitled to great weight because it reflects a judgment based on continuing observation over a number of years." *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986). The Commissioner is obligated to weigh the findings and opinions of treating physicians and to give "good reasons" in the written decision for the weight given to a treating source's opinions. SSR 96-2P, 1996 WL 374188, at *5; *see also* 20 CFR § 404.1527(c)(2).

Considering the factors under 20 C.F.R. § 404.1527(c)(1)-(5), Dr. Love's opinion must be examined closely. Dr. Love has been the primary treating physician for the Plaintiff's interstitial lung disease for many years. Dr. Love is a specialist that regularly examined the Plaintiff as her pulmonologist.

The ALJ's finding that Dr. Love's opinion was not supported by his own longitudinal treatment records is insufficient and conclusory as it does not adequately discuss the medical records of Dr. Love's treatment. The ALJ's entire discussion of the apparent inconsistencies between Dr. Love's opinion and treatment record is contained in a single sentence without any citations to the record. The ALJ stated "[i]n virtually every exacerbation noted, the claimant and her symptoms responded quickly to treatment." (R. 21.) This court has examined the record and finds the ALJ's statement to be lacking.

On October 19, 2010, the Plaintiff was seen by Dr. Love for "interstitial pneumonia diagnosed by open lung biopsy initially in 2005 for which she could not tolerate high-dose steroids." (R. 294.) Following the examination, Dr. Love recommended a 20mg dose of prednisone. He noted "[h]opefully it will be well tolerated without the emotional lability that she describes when she was placed on 80 mg, tapered to 60 mg, etc." (*Id.*) Less than three weeks

7

later on November 9, 2010, Dr. Love again examined the Plaintiff and stated the prednisone had to be cut from 20mg to 10 mg per day. (R. 293.) Dr. Love stated "[e]ven so, she did not tolerate that well. She is 'climbing the walls.'" (*Id.*) Dr. Love recommends the Plaintiff "[s]top the prednisone, since she cannot tolerate it." (*Id.*) The Plaintiff returned to Dr. Love three weeks later on November 30, 2010. (R. 292.) The Plaintiff reported that since her last visit "she had the worst week she has had of her chest feeling tight…but kind of recovered." (*Id.*) Dr. Love assessed that the Plaintiff's condition was "seemingly steroid-responsive," but that the Plaintiff had "intolerance to steroids." (*Id.*)

The Plaintiff was next examined by Dr. Love on March 3, 2011. Dr. Love stated that the Plaintiff had been "unable to take prednisone" since her last visit, but that her condition had not worsened. Dr. Love recommended a follow up in six months (*Id.*) Less than three months later, on May 20, 2011, the Plaintiff returned to Dr. Love's office because her interstitial lung disease had worsened two weeks prior and she resumed prednisone. (R. 290.) Dr. Love stated she improved with 20 mg of prednisone a day but recommended trying "to taper prednisone to 10 mg every other day, since she seems to be exquisitely sensitive." (*Id.*) On June 17, 2011, the Plaintiff had reduced her prednisone to 5 mg every other day. (R. 289.) Her cough had recurred but the Plaintiff did "not feel like it was bad enough to resume prednisone." (*Id.*) Dr. Love does describe her as "dramatically steroid-responsive" during this visit. (*Id.*)

On August 24, 2011, the Plaintiff was examined by Dr. Love and was off of prednisone, but she was "having problems." (R. 288.) The Plaintiff inquired about taking Imuran because it did not have the side effects of prednisone, but Dr. Love "hope[d]" that a low dose of prednisone would control her symptoms from the interstitial lung disease." (*Id.*) She was observed to have "severe restriction" in her lungs. (*Id.*) The Plaintiff returned to Dr. Love on October 12, 2011.

8

(R. 348.) The Plaintiff had tried to reduce her prednisone since the prior visit, but was unsuccessful. (*Id.*) She remained on 10 mg daily. On November 23, 2011, the Plaintiff again tried to reduce her steroid dose but her condition worsened, and she remained on 10 mg. (R. 347.) On January 23, 2012, the Plaintiff was again examined by Dr. Love. (R. 346.) The Plaintiff had increased her dose of prednisone to 20 mg per day over Christmas because she felt worse. (*Id.*) She was able to back down to 10 mg. Her treatment plan given by Dr. Love was to "[t]ry to hold the fort at 10 mg." (*Id.*)

"If a symptom can be **reasonably controlled** by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (emphasis added). There is substantial evidence that the Plaintiff's interstitial lung disease is responsive to prednisone. However, Dr. Love's records contain numerous references to the Plaintiff's apparent extreme sensitivity to the side effects of the prednisone. "The side effects of medication can significantly affect an individual's ability to work and therefore should figure in the disability determination process." *Flores v. Massanari*, 19 F. App'x 393, 399 (7th Cir. 2001) (citing *Porch v. Chater,* 115 F.3d 567 (8th Cir.1997); *Varney v. Secretary of Health & Human Servs.,* 846 F.2d 581, 585 (9th Cir.1988)). The ALJ's statement that the Plaintiff's "symptoms responded quickly to treatment" fails to address any of the evidence that the Plaintiff may not be able to sustain that treatment. The ALJ did not address her hyper-sensitivity to prednisone and its side effects in any way. Furthermore, it is entirely possible that Dr. Love's opinion is sound because it reflects the Plaintiff's inability to remain on prednisone to treat the symptoms of her interstitial lung disease. Because the ALJ failed to address the record regarding prednisone's substantial side effects and the Plaintiff's ability to remain on prednisone to manage her symptoms, this court cannot make a determination as to whether her symptoms "can be reasonably controlled by medication or

treatment." Without this necessary analysis by the ALJ, this court cannot determine whether the weight given to Dr. Love's opinion is supported by substantial evidence.[1]

The ALJ gave "great weight" to the opinions of the "State Agency medical consultants. (R. 23.) Dr. Damon Daniels, general practitioner, saw the Plaintiff for a consultative examination on June 1, 2011. (R. 282.) The record does not have any evidence Dr. Daniels ever treated the Plaintiff for any ailment. Dr. Daniels' only opinion concerning the Plaintiff's interstitial lung disease was that she had "an abnormal lung exam." (R. 284.) Dr. Daniels did not indicate what treatment her condition might require and never mentions any side effects of any treatments. The court is highly concerned that the ALJ gave Dr. Daniel's brief and undeveloped opinion "great weight" over the opinion of the Plaintiff's long-term, treating specialist. In discussing non-examining, state medical consultants, the Fourth Circuit has held that rejection of a treating physician's opinion in favor of state medical examiner's opinion raises "red flags." *Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013). Dr. Daniel's general examination of the Plaintiff one time on October 29, 2013 leading to the broad opinion that the Plaintiff had an "abnormal lung exam" raises similar red flags to this court. (R. 284.)

The three remaining reasons given by the ALJ for discounting Dr. Love's opinion do not rise to the level of substantial evidence. The ALJ's citation of SSR 96-5p is correct in that the determination of disability is ultimately left to the Commissioner. (R. 21.) However, the ALJ's statement that giving a treating source's opinion "controlling weight…would, in effect, give [the treating source] the authority to decide the issue of disability" is a misstatement of the law. As discussed *supra*, there are circumstances where a treating source's opinion is given controlling weight. "[A]ccording to the regulations promulgated by the Commissioner, a treating

---

[1] The ALJ did not assign a specific weight to the opinion of Dr. Love.

physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  When controlling weight is given to a treating source's opinion as to the nature and severity of an impairment, the ultimate decision of disability still must be made by the Commissioner.  This court is not asserting that the ALJ erred by not giving Dr. Love's opinion controlling weight, but only clarifying the law misstated by the ALJ.  This court cannot make a determination as to whether the ALJ gave proper weight to Dr. Love's opinion because the ALJ did not sufficiently address whether her symptoms can be reasonably controlled by prednisone with consideration of its side effects.

      The ALJ next asserts that Dr. Love's opinion is discounted because he "indicated that his assessment was based upon the claimant's responses to the questions."  (R. 21.)  The ALJ's statement is based on Dr. Love's response to the Plaintiff's ability to use her hands for repetitive motion tasks.  This response alone is not a reason to disregard the entire opinion of the Plaintiff's primary treating physician of her severe impairment for many years. As her treating pulmonologist for interstitial lung disease, Dr. Love most likely does not focus on the Plaintiff's ability to use her hands.  Dr. Love's medical records do not reflect any examinations or treatments regarding the Plaintiff's hands.  Certainly all productive doctor-patient relationships require communication between the doctor and patient as to the patient's symptoms and conditions.  The fact that Dr. Love included what the Plaintiff told him in forming his medical opinion as to her physical capacities is reasonable and expected and does not, by itself, taint Dr. Love's entire opinion.

Finally the ALJ asserts that a "doctor may express an opinion in an effort to assist a patient with him [sic] he or she sympathizes" and that "patients can be quite inconsistent [sic] and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients [sic] request and avoid unnecessary doctor/patient tension." (R. 21.)  The ALJ provides no evidence that either of these situations occurred in this case.  The court cannot find any evidence in the record of this occurring.  "[S]ympathy does not provide a valid reason for the ALJ to discount the opinions of [a treating physician]." *Fletcher v. Colvin*, C/A No. 0:12-CV-02888-DCN, 2014 WL 1252913, at *3 (D.S.C. Mar. 26, 2014) (citing *Foxman v. Barnhart,* 157 F. App'x 344, 347 (2d Cir. 2005) (holding that where there is no evidence to show that sympathy informed a doctor's opinion, the ALJ's conclusion that the doctor may have been swayed by sympathy was contrary to the treating physician rule)).

2. **The ALJ's Evaluation of the Plaintiff's Credibility**

 "The determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig v. Chater,* 76 F.3d 585, 594 (4th Cir.1996).

> First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.... It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig*, 76 F.3d at 593, 595.  Factors relevant to assessing a claimant's symptoms apart from objective medical evidence include "daily activities," "[t]he location, duration, frequency, and intensity of…symptoms," and "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your…symptoms,".  20 C.F.R. § 404.1529(c)(3).

12

The court "cannot make credibility determinations," but must "review the ALJ's decisions for substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005).

The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible for the reasons explained in this decision." (R. 22.)  At the hearing before the ALJ, the Plaintiff repeatedly testified about the side effects of her medications.  The Plaintiff testified her albuterol inhaler made her jittery and unable to function for 30 to 45 minutes after taking it (R. 49); she had been on prednisone "solid" for more than five years (R. 51); she has emotional instability caused by the prednisone (R. 53); she experiences fatigue and tiredness as side effects of her condition (R. 55); the fatigue requires her to sleep and take naps (R. 56).  The ALJ commented at the hearing on the vast variation in the Plaintiff's prednisone doses in trying to control her condition. (R. 52.)  At one point during the hearing, the ALJ commented, "boy look at those amounts….[w]ow, that is a lot of prednisone." (R. 52.)

The undersigned finds that the ALJ did not properly consider the side effects of the Plaintiff's medications in determining the Plaintiff's credibility.  Despite the Plaintiff's testimony regarding the side effects of treating her condition and the ample medical records evidencing those side effects discussed *supra*, the ALJ did not address the side effects in any way when making his determination the Plaintiff was "not entirely credible." (R. 22.)  The well-documented evidence of the Plaintiff's side-effects and her treating physician's notations of her sensitivity to prednisone require they be weighed in the ALJ's credibility analysis.  *See Barrett v. Comm'r of Soc. Sec. Admin.*, C/A No. 1:14-cv-2398-SVH, 2015 WL 631132, at *20 (D.S.C. Feb. 13, 2015) (holding that "[i]n light of well-documented evidence of Plaintiff's medication side

effects and difficulty finding effective medications, his psychiatrist's suggestion that he was particularly sensitive to the side effects of medications, and his documented efforts to cope with and minimize his side effects,…the ALJ did not properly consider the effectiveness and side effects of Plaintiff's medications in assessing his credibility.)  The complete lack of analysis as to the significant side effects endured by the Plaintiff renders the ALJ's analysis incomplete.[2]

## RECOMMENDATION

Based upon the foregoing, the court recommends that the Commissioner's decision be reversed and remanded for administrative action consistent with this recommendation to include *de novo* consideration of all pertinent issues, pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings as set forth above. Specifically, the ALJ is to properly develop the record and consider the side effects caused by the Plaintiff's treatment for her interstitial lung disease.

  IT IS SO RECOMMENDED.

January 11, 2016

Charleston, South Carolina

               _____
               MARY GORDON BAKER
               UNITED STATES MAGISTRATE JUDGE

---

[2] The case at bar is distinguished from *Goodwater v. Barnhart*, 579 F. Supp. 2d 746, 755 (D.S.C. 2007) *aff'd sub nom. Goodwater v. Astrue*, 263 F. App'x 338 (4th Cir. 2008) where the district court held that the ALJ's failure to specifically mention a treatment's side effects constituted harmless error.  The plaintiff in *Goodwater* cited to only one medical record that mentioned side effects endured by the plaintiff. *Id.*  Those side effects went away after medication was adjusted. *Id.*  In the case at bar, the Plaintiff's treatment records from numerous examinations spanning almost two years continuously address the Plaintiff's cyclical "catch-22" between treating her interstitial lung disease with prednisone and enduring the side effects.  The Plaintiff constantly had to stop taking the medication or adjust her dose to attempt to lessen the side effects.  The prednisone would then have to be resumed to treat her condition, and the side effects returned.